## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK YOUNG, | CIVIL ACTION |
| Plaintiff, | NO. _____ |
| v. | |
| CITY OF PHILADELPHIA, and DETECTIVE DONALD LYONS, and DETECTIVE THOMAS J. BROWN, in their individual capacities, | **COMPLAINT** |
| Defendants. | |

Plaintiff, Mark Young, by and through his attorneys, the Marrone Law Firm, LLC, hereby alleges as follows:

<u>PRELIMINARY STATEMENT</u>

1.      In April of 2024, after spending more than 40 years in prison for a crime he did not commit, plaintiff Mark Young was released from incarceration.  Mr. Young's conviction for the September 8, 1974 robbery of the Place Bar and the murder of a bar patron who was shot and killed by the robber's co-conspirator, was based entirely on coerced and fabricated witness testimony, each of whom had been intimidated and harassed by police to testify falsely against Mr. Young; a fabricated and coerced false confession, which the defendant police officers beat out of Mr. Young to sign; and unreliable, pseudo-scientific microscopic hair testing results. Decades after he was convicted, Mr. Young found several witnesses to the crime who had given statements to the police on the night of the crime that credibly identified the actual participants in the robbery and murder - neither of whom were Mr. Young – which the defendant detectives had intentionally withheld from Mr. Young and the prosecutor.

2.      In the early morning hours of Sunday, September 8, 1974, Walter Palermo, while a patron of the Place Bar on 2139 65th Avenue in Philadelphia, was shot and killed during the course of an armed robbery conducted by two black males.  One perpetrator with a hand gun jumped the bar, ordered the barmaid to open the cash register, took out $126 and ran out of the bar.  The other perpetrator shot and killed Palermo in the back with a shot gun.

3.      Based on descriptions and statements given by the barmaid and a female patron that night, the robbery was committed by a man named "Turtle," whose real name was Ronald Wilson.  Based on statements given by two male patrons of the bar that night, the shooter was Charles Sheppard.

4.      At the time of the incident, Wilson was a longstanding informant for the defendant detectives, who relied on him to give them names of gang members on which they could pin unsolved crimes.  Even though the defendant detectives knew that Wilson was Sheppard's co-conspirator who had committed the robbery, they did not want to charge him with the crime because they wanted to keep him as their informant.  So rather than arrest Wilson, they decided to pursue a prosecution against Mr. Young.  Mr. Young was not involved in the robbery or murder at the Place Bar that night.

5.      To advance their false allegations against Mr. Young, the defendant detectives engaged in the following unconstitutional conduct:

a.   directed Wilson to get Mr. Young to falsely confess to the crime and coerced Wilson to fabricate a statement falsely implicating him;

b.   fabricated and coerced Mr. Young's false confession;

c.   withheld from the prosecution and Mr. Young the barmaid's description of the robber and fabricated a new, false description;

d.  coerced the barmaid to falsely identify the robber as Mr. Young;

e.  withheld from the prosecution and Mr. Young the name and statements of the female patron who witnessed the robbery and identified the robber as Wilson; and

f.  withheld from the prosecution and Mr. Young the names and statements of the two male patrons who witnessed the shooting and identified Sheppard as the shooter.

6.  Had the defendant detectives not engaged in their unconstitutional fabrication of evidence, withholding of evidence and coercion of witnesses to make false statements, Mr. Young would have been able to significantly undermine the prosecution's case against him.

7.  Mr. Young was convicted on October 6, 1975 of murder in the second degree, robbery and criminal conspiracy. On August 12, 1976, the court imposed a sentence of life imprisonment for the murder conviction, concurrent with a sentence of 10-20 years for robbery and 5-10 years for conspiracy.

8.  The wrongful arrest and conviction of Mr. Young was part of a pattern and practice of the City of Philadelphia, whereby detectives of the Philadelphia Police Department Homicide Division routinely resolved cases by using coerced statements and testimony, as well as fabricated and suppressed evidence.

9.  On January 22, 2024, Mr. Young's PCRA petition was granted, and his conviction for second-degree murder and accompanying life sentence were vacated. On that same date, Mr. Young accepted a negotiated guilty plea to third-degree murder, first-degree robbery and conspiracy to commit third-degree murder, which carried a sentence of 22 ½ to 45 years. Judge Johnson accepted the plea agreement. Approximately three months later, on April 20, 2024, Mr. Young was released from prison and finally a free man.

10.     Mr. Young now brings this action under 42 U.S.C. § 1983 seeking redress for police misconduct that violated the Plaintiff's constitutional rights and caused him to be incarcerated for more than 40 years.

## JURISDICTION AND VENUE

11.     This action is brought pursuant to 42 U.S. § 1983 to redress the deprivation under color of law of the Plaintiff's rights as secured by the United States Constitution.  This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

12.     This Court has supplemental jurisdiction over the plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a).

13.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b) in that this is the District in which the claims arose.

## JURY DEMAND

14.     Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

15.     Plaintiff **Mark Young** is, and at all times relevant to this Complaint was, a resident of Pennsylvania.  Mr. Young was born on March 1, 1956.  On October 6, 1975, Mr. Young was wrongfully convicted of the second-degree murder of Walter Palermo and, as a result, served more than 40 years in prison.  Only when evidence of the Defendants' wrongful, illegal and unconstitutional conduct and Mr. Young's innocence came to light years later was

there a basis for his original charges, convictions and sentence to be vacated and he was able to be released from prison.

16.    Defendant **City of Philadelphia** is, and at all times relevant to this Complaint, was, a municipality located in the State of Pennsylvania.  The City of Philadelphia was, at all times relevant to this Complaint, officially responsible for the policies, practices and customs of the Philadelphia Police Department ("PPD"), and was the employer of the individual PPD Defendants in this matter.

17.    Defendant **Donald Lyons, Badge No. 982**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Lyons was assigned as a detective with the Homicide Division at the time of this investigation.

18.    Defendant **Thomas J. Brown**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Brown was assigned as a detective with the Homicide Division at the time of this investigation.

19.    Defendants Lyons and Brown are collectively referred to herein as "Individual Defendants."

20.    At all times relevant to this Complaint, the individual Defendants named above acted in concert and in conspiracy with one another in order to deprive Mr. Young of his constitutionally protected rights.

## FACTUAL ALLEGATIONS

### The September 8, 1974 Homicide of Walter Palermo

21.    In the early morning hours of Sunday, September 8, 1974, Walter Palermo, a patron of the Place Bar on 2139 65th Avenue in Philadelphia, was shot and killed during the course of an armed robbery.  On that date, at about 1:53 am, two black males with their faces covered by scarves entered the Place Bar.  One was armed with a shot gun and the other with a hand gun.  They announced that it was a hold up.

22.    The male with the hand gun jumped over the bar and told the barmaid, Juanita Dancey, to open the cash register.  He was yelling at her to open it because it was stuck.  He took $126.00 in cash from the register, then leaped back over the bar and ran away from the patrons.  Then, the male with the shot gun placed his gun into the back of Palermo, who was sitting at the bar.  He fired the gun one time, and the bullet lodged in Palermo's lower left back.  Both men fled the bar on foot, proceeding north on Wyncote Avenue and west on Stanton Avenue.  Palermo was pronounced dead just a few minutes later.

23.    During the robbery, the scarves fell off the faces of both assailants.  Uniformed and non-uniformed police came to the scene to investigate and they interviewed at least four patrons of the bar that night.  Two male patrons of the bar told police that they recognized the man with the shotgun who shot Palermo as Charles Sheppard, a 20-year-old black male.  The barmaid, Dancey, described the robber as 5'5" black male, with a light complexion.  A female patron named Shantee Neals first told a uniformed officer, and later a plain clothes officer, that she had witnessed the male with the handgun rob the barmaid and take money from the cash register.  She told them that she recognized this man from the neighborhood as someone who went by the name "Turtle."  However, as explained in greater detail below, except for Dancey's

name, the police withheld from the prosecution and Mr. Young the names of the other three

witnesses, and they withheld, falsified or destroyed any statements they obtained from all four

witnesses.

24.    Soon after the robbery and homicide took place, there was an announcement on

the radio that the police were looking for Charles Sheppard in connection with the Place Bar

incident.

**Mr. Young's First Police Encounter Regarding the Place Bar Incident**

25.    On Monday, September 9, 1974, Detectives Flanagan and Curley picked up Mr.

Young from his residence and brought him down to the Police Administration Building, a/k/a the

Roundhouse, at 8th and Race Streets in Philadelphia for questioning about the Place Bar robbery

and homicide.  Mr. Young was on the PPD's radar because he had put up $200.00 and signed for

bail for Sheppard for a crime he was charged with committing about six months earlier, in March

of 1974.  Mr. Young and Sheppard knew each other because they had been members of the

Somerville Gang.  But by March of 1974, Mr. Young had not been involved in the gang for two

years, and he and Sheppard no longer hung out with each other.  The only reason Mr. Young

posted bail for Sheppard was that the money he put up was not his – he was delivering it on

behalf of another who could not take off of work.

26.    Because the police had not yet found Sheppard, Detectives Flanagan and Curley

questioned Mr. Young in detail about the nature of his relationship with Sheppard, and about

whether he knew Sheppard's whereabouts.  Mr. Young was forthright about his relationship with

Sheppard, and provided the detective with the address of the corner where Sheppard could be

found.  Detective Flanagan also asked Mr. Young where he was on the night of the Place Bar

murder, and whether he had ever been there.  Mr. Young told him - truthfully - that that he had

been home all day and night that Saturday and into Sunday morning, and that he had never been inside the bar.  He told the detectives that he heard about the Place Bar murder and robbery the night after it occurred when he was at a birthday party for his mother, and his sister was talking about it after hearing on the radio that the police were looking for Sheppard in connection with the crime.

27.     Detectives Flanagan and Curley then asked Mr. Young if he'd be willing to take a lie detector test on these questions, and Mr. Young agreed to take it.  Then Detective Brady gave him a lie detector test, and, among other questions, asked him whether he was at the scene of the crime, and whether he had robbed the bar or shot the bar patron.  Mr. Young passed the polygraph test, signed it, and was permitted to leave police custody.

**Defendants Coerce Their Informant, Who is the Actual Perpetrator of the Place Bar Robbery, to Fabricate a Statement that Falsely Implicates Mr. Young as the Perpetrator**

28.     Just a few days later, on or around September 11, 1974, Ronald Wilson, a/k/a "Turtle," came by Mr. Young's house and asked if he could borrow a shirt.  Mr. Young and Turtle knew each other because Turtle was in the Somerville Gang, the same gang that Mr. Young and Sheppard had belonged to.  However, he and Turtle no longer hung out with each other because at that time Mr. Young had not been involved in the gang for several years.  While at his house, Turtle did not ask Mr. Young about the Place Bar incident, and Mr. Young did not discuss it.

29.     In the 1970's, PPD homicide detectives solicited cooperation from vulnerable informants to work with them to "solve" crimes.  For several years before the Place Bar incident, Defendant Detectives Lyons and Brown had Wilson working for them as one of their informants. Because Wilson had been in the Somerville Gang, they relied on him to give them names of gang members on which they could pin unsolved crimes –whether the accused were actually guilty or

not.  In exchange for his loyalty to Detectives Lyons, Brown and other PPD homicide detectives, Wilson escaped getting charged with crimes the police had evidence he committed, got criminal charges dropped, or got sentences reduced for crimes he was charged with committing.

30.    Because the police could not find Sheppard, Detectives Lyons and Brown were under pressure to arrest and charge someone involved in the crime, which left only Sheppard's co-conspirator.

31.    Detectives Lyons and Brown knew that Wilson was Sheppard's co-conspirator who had committed the robbery.  On the night of the incident, Witness Shantee Neals Williams gave statements to two different members of the PPD identifying the robber as "Turtle," and the detectives knew who Turtle was because he was their longstanding informant.

32.    Nevertheless, the detectives decided not to charge Wilson with the crime because they wanted to keep him on as their informant.  Because they were armed with the knowledge that Wilson was the one who actually committed the Place Bar robbery, they knew they could hold this over his head to manipulate him to implicate any suspect they wanted in this case, as well as in other "unsolved" cases.  They knew that Wilson knew he was always at risk of being charged with being Sheppard's co-conspirator in the Place Bar robbery and murder, and thus could be easily manipulated to provide them with false testimony against someone else they decided to charge with the crime.

33.    To advance this scheme, Detectives Lyons and Brown directed Wilson to seek out Mr. Young and get him to implicate himself as having participated in the Place Bar crime.  In compliance with the Detectives' directive, Wilson went to Mr. Young's house in mid-September of 1974 under the guise of borrowing a shirt from him.  However, while at his house, Wilson did not ask Mr. Young about the Place Bar incident, and Mr. Young did not discuss it.

34.     Even though Mr. Young never told Wilson that he had robbed the Place Bar, Wilson provided a false statement to Detectives Lyons and Brown, attesting to Mr. Young confessing to the following facts:  On the night of the murder, Mr. Young and Sheppard entered the Place Bar armed.  Then Mr. Young jumped the bar, and when the cash register was stuck closed, he forced the barmaid to open it.  Mr. Young then took the money from the register, jumped back over the bar, grabbed a bottle of liquor and ran out of the bar.

35.     Detectives Lyons and Brown coerced Wilson to falsely inculpate Mr. Young as participating in the Place Bar homicide and robbery.  Because they knew that Wilson was the actual perpetrator of the Place Bar robbery, they knew that Wilson's statement inculpating Mr. Young in the crime was false.

**Detectives Lyons and Brown Coerce Mr. Young to Sign a Prepared Confession**

36.     On October 21,1974, at 18½ years old, Mr. Young enlisted in the U.S. Army.  On November 6, 1974, while Mr. Young was in basic training, the Mt. Holly, New Jersey police arrested him at Fort Dix army base in New Jersey.  He was charged with second-degree murder, robbery, conspiracy, receipt of stolen property, and violation of the Pennsylvania Uniform Firearms Act for the September 1974 robbery of the Place Bar.

37.     The Mt. Holly police took him to the New Jersey state courthouse for his extradition hearing.  They placed him in a room outside of the hearing room, where PPD Detectives Lyons and Brown were waiting for him.

38.     Defendant Detectives Lyons and Brown used several means to pressure him to waive his right to an extradition hearing:  (a) They told him that if he stayed in New Jersey, he was at risk of being hurt or killed by "white farm boys" being held in New Jersey County prison; (b) they showed him Wilson's statement implicating him as having confessed to committing the

robbery with Sheppard that night; and (c) they showed him a prepared confession, which was based on the wording in Wilson's false statement, that they wanted Mr. Young to sign.

39.     Because Mr. Young feared for his life if he was locked up with New Jersey gang members, he agreed to waive extradition and go to Philadelphia.

40.     While Detectives Lyons and Brown transported Mr. Young to Philadelphia in a police car, the detectives informed him that Wilson had been working for them as their informant for a long time, serving as an infiltrator into the conduct of members of the Somerville Gang. They again showed him Wilson's statement and the confession they prepared for him to sign. Mr. Young still refused to sign the confession.

41.     Around 6:00 pm that day, while still in his military clothes, Mr. Young was brought to the Roundhouse.  Over the course of the next 15 hours, Mr. Young was subjected to isolation, inhumane conditions, unlawful interrogation, and physical assault.

42.     At about 6:15 pm, the detectives placed Mr. Young in a small room.  He was seated on a metal stool, which was welded to the ground, and his hand was shackled to the stool with handcuffs.  For the next three hours, Detectives Lyons and Brown interrogated Mr. Young. Detective Brown came into the room and began the interrogation by asking him what he knew about the Place Bar incident and whether he participated in the crime.  When Mr. Young told him that he was not there and did not participate in the crime, Brown left the room and Detective Lyons came in.  When Mr. Young continued to deny his participation in the crime, Detective Lyons began yelling at him.  Then Detective Brown came back into the room and told Detective Lyons to calm down.  Brown left the room again, and Detective Lyons started to physically assault Mr. Young.  He grabbed Mr. Young and tried to pull him up to a standing position, which almost resulted in pulling his arm out of its socket because his arm was handcuffed to the chair

that was bolted to the floor.  Detective Lyons kept threatening him by saying: "You're gonna tell us what we want, or else you're not gonna leave this room!"  Detective Brown walked back into the room and stopped Lyons' physical assaults and told him to calm down.  Detective Brown left the room again and when Mr. Young continued to deny that he had participated in the crime, Detective Lyons's assaults escalated.  While threatening Mr. Young that he would not be released from his confinement to the chair in the small room unless he signed the prepared written confession to the crime, Detective Lyons punched him on the side of his head with his hand.  Detective Brown walked in again, and "stopped" Lyons from punching Mr. Young.  He tried to convince Mr. Young to sign the prepared confession, but Mr. Young refused.

43.    Detectives Brown and Lyons continued many cycles of this "good cop, bad cop" routine until about 9:00 pm.  During the entire three-hour interrogation, Mr. Young was denied access to food, water, the use of a bathroom, an attorney or the ability to call anyone for nine hours, all while he was chained to a metal stool bolted to the floor.

44.    After Detectives Lyons and Brown had been gone for awhile, Mr. Young banged on the wall and floor, which got the attention of another detective who was interrogating other people in rooms near his room.  One of these detectives escorted him to the bathroom, which he was finally allowed to use for the first time in hours.

45.    Detectives Lyons and Brown returned to Mr. Young's interrogation room at around 6:00 am the next morning, where, except for a few trips to the bathroom, Mr. Young had been sitting alone, chained to a metal stool without access to food, water, or the ability to call anyone for nine hours.

46.    The detectives resumed their harsh interrogation, but because Mr. Young continued to refuse to sign the false confession, Detective Lyons resorted to use even harsher

tactics.  In addition to striking Mr. Young's head with his hand, Detective Lyons used a flapjack

(sometimes referred to as a "blackjack") on his head, elbows and knees.  Although the hits with

the weapon did not leave a mark on his body, they were extremely painful.

47.     After enduring these physical assaults and harsh custodial conditions for almost

15 hours, Mr. Young became weak, his hands were trembling, and he stopped talking.  He truly

believed that the detectives were going to kill him.  Consequently, he eventually acquiesced to

their coercion and brutality and told them that he'd sign the confession.

48.     However, he intentionally only scribbled his name as opposed to signing it.  Later,

the detectives forged his signature on the written confession, which they obtained from the lie

detector test that Mr. Young had signed when he took it in September.

49.     At around 9:30 am on November 7, 1974, after Detectives Lyons and Brown had

detained him at the Roundhouse for more than 15 hours, where they denied him food, water, use

of a bathroom, and the ability to call anyone, and they literally beat a confession out of him, Mr.

Young was taken to the magistrate to be arraigned.

50.     This compulsory and false self-incrimination was facilitated by Detectives Lyons

and Brown using Wilson's statement inculpating Mr. Young in the crime – which the defendant

detectives had fabricated – and by subjecting Mr. Young to inhumane interrogation conditions

and techniques as described above.  The detectives were aware that these conditions would yield

a confession and intentionally exploited these conditions to overbear Mr. Young's will to resist

falsely incriminating himself.  Defendants not only crafted a false confession, but they also

coerced Mr. Young to adopt it.

**Defendants Fabricate Dancey's Description of the Robber and Coerce Her to Falsely Identify the Robber as Mr. Young to Support Their False Allegations Against Him**

51.    Before Mr. Young was arrested in November of 1974, Detectives Lyons and Brown knew that in order to arrest him, they needed more evidence implicating him in the Place Bar robbery than just Wilson's false hearsay statement that Mr. Young confessed to committing the crime.  So they set out to coerce the barmaid, Dancey, to identify Mr. Young as the robber that night.  The detectives went to the bank where Dancey was employed, and showed her six photos that they had obtained after conducting a search of Sheppard's residence.  Four of the six photos depicted Mr. Young and two photos depicted other gang members.

52.    However, despite the Detectives showing Dancey this highly suggestive, unreliable photo array, Dancey could not identify any of the people depicted in them as having participated in the Place Bar robbery and murder.  Even when the detectives returned to Dancey's place of employment and again showed her the same photos again, Dancey was still unable to identify any of the people depicted in them as having participated in the Place Bar incident.

53.    Consequently, the detectives falsified the homicide record to implicate Mr. Young by changing the actual description of the robber that Dancey gave police the night of the incident.  Dancey had described the robber as being 5'5" tall, with a light complexion, and no facial scars.  The detectives changed her description of the robber to being 5'11", with a dark complexion and a scar above his left eye.  This latter, falsified description matches Mr. Young's characteristics.  The detectives withheld Dancey's actual description of the robber from the prosecution and Mr. Young.

54.    Mr. Young and his counsel were never given or shown a statement by Dancey identifying him from the photo array.  But while he was awaiting trial, the prosecutor showed his

counsel the six photos that Dancey was shown, and told him that the prosecution intended on using Dancey's identification of him from this photo array at trial. Consequently, Mr. Young's counsel moved to suppress these photos and Dancey's identification of him.

55.     Once the detectives were facing a suppression hearing, they understood that it was imperative for them to get Dancey to make an actual identification of Mr. Young. To meet this goal, they coerced her by threatening with criminal charges. Specifically, in the course of their investigation of the Place Bar incident, Dancey had told Detectives Lyons and Brown that she knew the decedent, Walter Palermo, very well because he had been a regular at the Place Bar. Because Palermo was only 19 years old when he was killed, the detectives used the fact that he was underage to threaten to charge Dancey with serving alcohol to a minor if she did not cooperate with the police in identifying Mr. Young from the photos.

56.     Dancey acquiesced to the detectives' threats and badgering. In early January, 1975, at a suppression hearing before Judge Matthew Bollock, Jr., Detectives Lyons and Brown actually testified about the fact that they showed Dancey the six photos on two occasions and that she was unable to identify anyone in them. Then Dancey took the stand and she was shown the six photos for a third time. This time, she chose one photo of the six, which depicted Mr. Young, and testified that this photo was a picture of the robber. She then identified Mr. Young, who was in the courtroom, as the man who was in the single photo she picked out. Despite the unreliability of Dancey's identification of Mr. Young, the court allowed this coerced, overly suggestive and unreliable identification of Mr. Young to be presented at trial.

57.     Thus, with respect to witness Dancey, the defendant detectives withheld her actual description of the robber from the prosecution and Mr. Young, and fabricated a different description of the robber that matched Mr. Young's characteristics; on at least two occasions

showed her a highly suggestive, unreliable photo array to get her to identify Mr. Young as the

robber; Dancey could not identify any of the people depicted in them as having participated in

the Place Bar robbery and murder, and threatened to press criminal charges against her if she did

not identify Mr. Young from the photos.

**Mr. Young's Two Trials**

58.     In May of 1975, trial commenced before the Honorable Robert A. Latrone and a

jury.  In advance of his trials, the PPD did not give the prosecutor or Mr. Young the statements

given by the two male patrons at the Place Bar who witnessed and identified Sheppard as the

shooter, nor the two statements witness Shante Neals Williams gave to police in which she

identified the male who robbed the Place Bar as "Turtle."  Mr. Young was given only his own

coerced, false confession.

59.     Because Wilson did not appear at trial, his statement did not come into evidence.

But Mr. Young's coerced confession was admitted into evidence through the testimony of

Detectives Brown and Lyons.  Although Mr. Young testified in his defense, the Court did not

allow him to testify about how the confession was involuntary and the product of psychological

coercion and physical abuse by Detectives Lyons and Brown.

60.     Detectives Lyons and Brown testified about the process by which they showed

Dancey a photo array of six photos, and that she picked one that depicted Mark Young as the

robber that night.  When Dancey took the stand, the prosecutor showed her the same six photos

that she had seen at least three times before, and asked if she recognized anyone in the photos as

being the robber the night of the Place Bar incident.  Dancey picked the one photo that she had

picked at the suppression hearing, and pointed to Mr. Young in the courtroom as the same person

as in the photo who committed the robbery.

61.    On cross examination, Mr. Young's counsel was not permitted to ask Dancey whether the PPD threatened to charge her with serving alcohol to a minor from when she served the decedent.  But he was allowed to show Dancey the six photos.  When he did, he asked her if she saw Mr. Young depicted in more than one of the photos.  She said that she did not.  Then the Court granted defense counsel's request to allow the jury look at the six photos, and to ask the jury to compare the photos to Mr. Young, who was seated in the courtroom.

62.    The prosecution also presented evidence of microscopic hair testing results, which placed Mr. Young's hair on the cash register at the Place Bar.

63.    During jury deliberations, the jury asked to see the six photos shown to Dancey again.  The Court declined their request, and sent them back to deliberate further without the photos.  The jury was unable to reach a verdict, and the Court declared it a mistrial.

64.    Four months later, in September of 1975, the case was retried before a different judge, the Honorable John A. Geisz, and a new jury.  In contrast to the first trial, during the second trial, Mr. Young's counsel was not allowed to use the photo display in cross-examining Dancey or to show it to the jury.  Instead of allowing into evidence a display of the photographs Dancey had to choose from during pre-trial photographic identification, the trial court allowed Detectives Lyons and Brown to communicate a "verbal picture" of the photo identification process.  Dancey testified that she had picked out one photo from the group of six, which was a photo of Mr. Young, and pointed to Mr. Young in the courtroom as the same person as in the photo who committed the robbery.

65.    On October 6, 1975, the second jury found Mr. Young guilty of second-degree murder, robbery and criminal conspiracy.  Post-verdict motions were denied, and on August 12, 1976, Mr. Young was sentenced to life in prison.

**Fact Witnesses at Sheppard's Trial Withheld By Detectives Lyons and Brown**

66.     The police did not locate Sheppard until many years after Mr. Young was convicted.  Sheppard was not tried for the murder of Palermo at the Place Bar until the early 1980s.  Two male patrons who were at the Place Bar the evening of the robbery and murder testified at Sheppard's trial that they had witnessed Sheppard shoot Palermo.  Sheppard was found guilty of murder and sentenced to life in prison.

67.     Detectives Lyons and Brown knew about these two male witnesses soon after the Place Bar incident occurred.  In fact, it was these two witnesses' identification of Sheppard that night that enabled the PPD to put out a call on the radio within a day of the Place Bar incident with Sheppard's name and description.

68.     However, Mr. Young first learned about the existence of these two witnesses years after Sheppard's trial concluded.  Detectives Lyons and Brown purposefully withheld the names and statements of these two witnesses from Mr. Young before, during and after his trial and conviction.

69.     Additionally, Mr. Young was never notified of Sheppard's trial.  He only learned about the trial and the existence of these two witnesses years after Sheppard was convicted.  At that time, he asked an investigator to find the witnesses and talk to them.  Once found, these two witnesses told the investigator that although they only witnessed Sheppard's conduct that night, they knew that a female patron of the bar had observed the man who committed the robbery, and knew her name was Shantee Neals.  After many years of investigation, Mr. Young located Ms. Neals, who by then was Shantee Neals Williams.

**Shantee Neals Williams' Exoneration Testimony**

70.     Because Shante Neals Williams had moved out of state, it took Mr. Young many years to find her.  Finally, in 2008, Williams signed an affidavit attesting to what she had witnessed during the robbery and murder.  By the night of the incident, she had become a regular patron of the bar that year because her boyfriend, Harold Fawlin, was a regular there.  That night, she saw two black males enter the bar.  She then saw one of them jump over the bar and get within inches of the barmaid, who was Dancey.  From a distance of about three or four feet, she observed the male yelling at the barmaid to give him the money in the cash register.  The barmaid was having trouble opening the register, so he kept yelling at her until she got it open and gave him the money.  He then leaped back over the bar and ran away from the patrons.  Williams stated that she saw the face of the man who jumped the bar.  She recognized him from around the neighborhood and knew he was called "Turtle," but she had never seen him at the Place Bar.

71.     Williams then observed the other black male, who had a shotgun, shoot a white male patron.  But she did not see the shooter's face.  She said that the shooting was without provocation.

72.     After the robbery and shooting, Neals Williams remained on the scene.  The patron who had been shot was taken to the hospital.  A uniformed police officer questioned Williams about what she had observed that night, and she told him the same thing that she stated 34 years later in her affidavit.  Then another officer, in plain clothes, whom she did not know whether he was a detective, also asked her questions and she told him what she had observed that night.  Williams then left the bar.  She continued to patronize the bar for only one more month, which was when she and Fawlin broke up.

73.     After being questioned that night by the police about what she had witnessed, Neals Williams never heard from anyone regarding the incident until 33 years later, when an investigative reporter named Robert Hicks contacted her.  Hicks showed her pictures of Mr. Young taken around 1974 and asked her if those pictures depicted the individual she had seen rob the Place Bar.  She told him that the pictures were clearly not those of the robber she knew as "Turtle."  She was certain that she had never met or known the man depicted in those pictures, and that he was not the one who robbed the Place Bar in 1974.

74.     Detectives Lyons and Brown knew about Neals Williams and the two statements she gave to the PPD right after the Place Bar incident that identified the robber as "Turtle." However, the detectives purposefully withheld from the prosecutor and Mr. Young Williams' name and the two statements she gave to police.

**Sheppard's Exoneration Testimony**

75.     In 2008, Sheppard signed an affidavit stating that Mr. Young had never been with him at any bar, and had never committed any robberies with him.  This included the Place Bar robbery.  He stated that Mr. Young was not with him at the Place Bar on September 7-8, 1974.

76.     Thus, the defendant detectives withheld from the prosecution and Mr. Young the names and statements of the two males who witnessed the shooting and identified Sheppard as the shooter, and withheld the name and statements of the female patron of the bar, Shantee Neals, who witnessed the robbery and identified "Turtle" as the shooter.  If Mr. Young had been told about any of these witnesses before his trial, he could have found them and undermined the prosecution's case against him.

**Wilson Admits that He Falsely Named Mr. Young As the Robber**

77.     While Mr. Young was housed in the detention center awaiting trial, Wilson was confined in the same facility on charges of sexual assault.  At this time, Wilson told Mr. Young that the real reason he came to his house in September of 1974 was not to borrow a shirt, but to set him up so that he could give the police his name to take the heat for the Place Bar robbery. Wilson told Mr. Young that he falsely named him because the detectives told him that the only way he could get criminal charges dropped or reduced was to "give them a name" of the person who committed the robbery at the Place Bar with Sheppard.  He said he didn't think it would turn out as badly as it had, and promised he'd "make it right" for Mr. Young by talking to the police or prosecutor, and offering to testify for him at trial.  However, Wilson never showed up at trial or made anything "right" for him.  Nor did Wilson tell Mr. Young that *he* was the actual co-conspirator with Sheppard who committed the robbery at the Place Bar that night.

**Mr. Young's Second-Degree Murder Conviction and Life Sentence are Vacated**

78.     Decades after his convictions, Mr. Young discovered that DNA forensics were replacing the unreliable, unscientific microscopic hair testing that was performed in his case.  He filed an amended PCRA petition, in which he requested DNA testing of the hair found at the scene of the incident in 1974, arguing that the PPD's use of microscopic hair testing to place Mr. Young at the scene of the incident and the admission of this evidence at his trial entitled him to his conviction being overturned.

79.     On January 22, 2024, the Honorable Shanese Johnson of the Philadelphia Court of Common Pleas granted Mr. Young's PCRA petition, vacated his conviction for second-degree murder and the other felony convictions, and vacated his sentence to life imprisonment.  On that same date, Mr. Young accepted a negotiated guilty plea to third-degree murder, first-degree

robbery and conspiracy to commit third-degree murder, which carried a sentence of 22 ½ to 45 years.  Judge Johnson accepted the plea agreement.  Approximately three months later, on April 20, 2024, Mr. Young was released from prison and finally a free man.

**The Defendant Detectives' Conduct Was Caused By the PPD
Homicide Division's Longstanding History of Unconstitutional Practices
and the City of Philadelphia's Deliberate Indifference to Those Practices**

80.    The unconstitutional conduct of the defendant detectives described above was directly and proximately caused by a long-established history of practices in the PPD in general and specifically in the PPD Homicide Division.

81.    For many years, dating back at least to the 1970's, and continuing through and beyond the time of the investigation into the robbery of the Place Bar and death of Walter Palermo, the City of Philadelphia had in force and effect a policy, practice, or custom of unconstitutional misconduct in homicide investigations, and in particular, using coercive techniques in interviews and interrogations to obtain incriminating evidence; fabricating inculpatory evidence; conducting improper identification procedures; concealing or withholding exculpatory evidence; tampering with or manufacturing evidence; and fabricating incriminating statements from witnesses, suspects, and arrestees.

82.    These practices were well known to the City of Philadelphia and its policymakers as a result of newspaper investigations including Pulitzer Prize winning reporting in the Philadelphia Inquirer in 1977, governmental investigations, complaints from lawyers and civilians, and internal police investigations.

83.    Various cases demonstrate that this misconduct was pervasive within the PPD prior to and around the time of the Palermo murder investigation and Mr. Young's trial and sentencing in 1975 and 1976, and thereafter.

84.     As described in the 1977 *Philadelphia Inquirer* investigation, PPD homicide detectives routinely used beatings, threats of violence, intimidation, coercion and knowing disregard for constitutional rights in the interrogation of homicide suspects and witnesses, to wrench confessions from them, at the Roundhouse.   These cases, where the courts deemed the interrogations illegal and the confessions were thrown out, include the following:

a.  **James Howell**: On Dec. 3, 1971, James Howell, 18, was arrested for the rape, robbery and murder of Henrietta Tucker. The court ruled that Howell was subjected to "undue psychological duress" during a 20-hour interrogation, and his confession was thrown out.

b.  **Louis Roach**: In March 1972, Roach was a 20-year-old black suspect in the murder of a student. He was held at the Roundhouse for 19 hours, handcuffed to a metal chair, his face swollen and blood streaming from his nose and mouth. The court found that the interrogation was illegal, and that Roach was "the hapless victim of impermissible psychological coercion . . . by five detectives with interrogative expertise."

c.  **Larry Howard**: In April 1973, Larry Howard, 28, a black suspect in the shooting of two policemen, was kicked, beaten with a lead pipe and punched with handcuffs and brass knuckles during an interrogation ruled illegal by the Court.

d.  **John Wardlow**: On June 10, 1973, Wardlow, a 15-year-old sophomore, was arrested for the murder of another youth based solely on the basis of a tip that the homicide division altered to falsely incriminate him. Police interrogated him for more than 7 hours, during which time they hit him with a blackjack, poked him in the chest and punched him in the head. He agreed to sign a false confession out of fear and wanting to go home. Six months later, the court ruled the interrogation illegal and threw out the confession.

e.  **James Churchill**: In June 1973, James Churchill was picked up as a possible witness in the murder of his friend Reginald Adams. After he was forced to stay in an interrogation room over a period of approximately 27 hours during which eight interrogations were held, he allegedly confessed to the crime. The court threw out his confession.

f.  **Mary Kirkman**: On January 3, 1974, Kirkman was arrested as a suspect for murder. Police questioned her even after she refused to talk and asked to see a lawyer. Two and a half hours later, she still denied involvement in the shooting and refused to sign a statement.  Two hours later, her attorney arrived at the Roundhouse, but the detectives kept interrogating her for another 20 minutes. Then Kirkman signed a statement admitting to some involvement in the shooting. Then she met with her lawyer, who instructed her to remain silent and told the

detectives not to interrogate her anymore. After the lawyer left, Kirkman was still interrogated for another 19 hours, wherein she gave 3 more statements, which were progressively more inculpatory. The court ruled the interrogation illegal because the police had cajoled and misled her and her statements were the product of psychological coercion.

85. Other cases involving conducting improper identification procedures; concealing or withholding exculpatory evidence; tampering with or manufacturing evidence; and fabricating incriminating statements from witnesses, suspects, and arrestees, include:

a. **Matthew Connor**: In 1980, Connor was convicted of the 1978 rape and murder of an 11-year-old girl whose body was found in the stairwell of an apartment building in Philadelphia. The medical examiner determined that the victim's wounds resulted from an ice pick. In 1989, while Connor was serving a life sentence, a non-profit organization persuaded the Philadelphia District Attorney's Office to revisit the case. The prosecution then discovered that police failed to turn over exculpatory evidence, including a recording of a call with a prosecution witness that contradicted her trial testimony, and evidence that police considered the victim's half-brother, who had a history of assaulting young girls and was observed carrying an ice pick around the apartment complex, as an alternative suspect. In February 1990, Connor was granted a new trial, and the next month the charges were dismissed.

b. **Gerald Howell**: In late 1982 into the early months of 1983, Philadelphia Police Detectives coerced witnesses into inculpating Howell in a murder that was committed by Kenneth Parnell. PPD Detectives told Arlene Williams, a teenager at the time, that they would arrest Parnell, the father of her child, for the murder if she did not sign a statement inculpating Howell. PPD Detectives also threatened two other teenage witnesses with arrest if they did not come to court to testify against Howell, even though the police had reason to believe that Parnell was the real shooter. Additionally, PPD Detectives suppressed information given to them by the brother of the decedent that Parnell was the shooter. Years later, Parnell confessed to the murder for which Howell had been convicted. In 2022, the DAO conceded that the PPD had suppressed exculpatory evidence. In 2023, a federal judge granted Howell's habeas corpus petition and vacated his conviction. Howell was released in 2023 after being imprisoned for four decades for a crime he did not commit.

c. **Bruce Murray and Gregory Holden**: In 1983, Murray and Holden were convicted of a 1980 murder based on PPD Homicide Division detectives knowingly presenting fabricated trial testimony, coercing false witness statements, and suppressing exculpatory evidence. Murray and Holden were exonerated in April 2023 and January 2024 respectively based on the DAO's

acknowledgement that numerous pieces of favorable evidence were suppressed during the original trial.

d.   **Alen Lee:** In September 1983, Alen Lee was arrested in connection with the murder of 25-year-old restaurant manager Jade Wong. The murder was committed by three Asian men who announced that they were gang members from New York City and who tried to extort Wong for money. Philadelphia detectives secured a conviction of Lee by fabricating an informant statement to implicate Lee, despite having credible information pointing to alternative suspects. Ultimately, Lee's conviction was vacated in April 2004 after Lee presented evidence that at the time of his trial, Philadelphia police failed to disclose evidence of the true perpetrators.

e.   **Willie Stokes**: In 1984, PPD detectives arrested a man named Franklin Lee on rape and related charges. After his arrest, homicide detectives interviewed him about a 1980 murder and falsely told him that another witness had identified Willie Stokes as the person who committed that murder. Detectives insisted that Lee knew that Stokes was the murderer and that he needed to cooperate with their investigation, or, otherwise they would "hang" him. Lee succumbed to the pressure and agreed to sign a false statement implicating Stokes in the murder. For years, Lee continued to have contact with the investigating detectives, who, in order to maintain control over their informant, arranged for him to have access to drugs and sexual encounters while incarcerated. Stokes remained wrongfully imprisoned for 39 years until December 2021 when a federal district court vacated his conviction based on the investigating detectives' pervasive misconduct.

f.   ***Commonwealth v. Raymond Carter*** – This matter, which was investigated from 1986 until his conviction in 1988, resulted in the exoneration of Mr. Carter after former police officer Thomas Ryan was indicted in February 1995 on federal corruption charges.  A Philadelphia judge ordered a new trial because the prosecution's star witness had been paid $500 by then-officer Ryan to testify against Carter.  The City of Philadelphia paid a "churchgoing grandmother" a significant settlement after she sued alleging Ryan helped frame her and send her to prison for 3 years.  In 1996, the Philadelphia Inquirer reported that Officer Jack Baird, who was Ryan's partner, fabricated evidence because Ryan wanted the overtime compensation often available to officers in murder investigations.

g.   **Curtis Crosland**: In 1987, PPD officers interviewed an informant with a long history of violent crimes who was seeking assistance from law enforcement to reduce his sentence for a parole violation. The informant told officers that Curtis Crosland had at some undetermined time in 1986, confessed that he committed a 1984 robbery and murder at a neighborhood grocery store in South Philadelphia. Investigating detectives knew that the informant's statement was false; the informant had provided inconsistent information to police, had failed a polygraph, and had told other family members that another person—that is, not Curtis Crosland—had admitted to the crime. Despite this knowledge, detectives

persisted in bringing charges against Crosland and then suppressed all information in their possession showing the falsity of the informant's testimony. Further, detectives suppressed and concealed information pointing to an alternative suspect—information that was highly credible as the suspect matched the size and description of the perpetrator given by eyewitnesses to the shooting. Crosland was convicted as a result of these unlawful police tactics and remained incarcerated for 34 years until an investigation by the CIU located he referenced exculpatory information in police files. In 2021, a federal district court accepted the CIU's concession that Crosland was entitled to relief and was likely innocent, and, therefore, vacated the conviction.

h. **Andrew Swainson**: PPD Homicide Division detectives based their 1988 arrest of Swainson on the testimony of a single witness who had been taken into custody while running from the scene of the murder in blood-soaked clothes. The witness provided a facially unbelievable narrative of the shooting after PPD detectives coerced him into identifying Swainson as the perpetrator. After this witness recanted his statements several times, PPD detectives pressured a different vulnerable young witness to support his false claims at trial. Based on this misconduct and the suppression of exculpatory evidence, in June 2020, Swainson's conviction was vacated and all charges were dismissed.

i. **Pedro Alicea:** In 1989, after failing for four years to resolve a 1985 double homicide of brothers Hector and Luis Camacho, PPD detectives fabricated a case against Pedro Alicea out of whole cloth. To build a false case against Alicea, detectives disregarded significant evidence demonstrating that two local drug dealers were responsible, and leaned on vulnerable individuals to obtain false identifications of Alicea as the shooter. The officers pressured Angel Fuentes, a longtime informant who had a close personal relationship with the lead detective, and who was facing significant prison time on a number of open charges, to endorse a fabricated statement identifying Alicea as the shooter. They then coerced Ray Velez, who had himself been implicated in the murders, to likewise falsely identify Alicea as the shooter, by detaining him and threatening to charge him with the murders if he did not submit. Detectives suppressed substantial exculpatory evidence, including a reliable eyewitness statement, pointing to the true perpetrators. Alicea was convicted as a result of the detectives' misconduct and wrongfully imprisoned for more than 31 years before the exonerating evidence was discovered by the CIU, resulting in the vacatur of his conviction and release in 2020.

j. **Donald Ray Adams**: PPD Homicide Division detectives coerced a witness to implicate Adams in a 1990 murder by threatening the witness and also offering to provide her financial support for her testimony. In securing the statement, detectives ignored the fact that Adams's physical description was vastly different from the description provided by witnesses at the scene. Adams's conviction was later vacated, and he was acquitted at a retrial. His subsequent civil suit resulted in a financial settlement.

k. **Ronald Johnson**: Following a 1990 homicide, PPD Homicide Division took nine different statements from two witnesses who had initially exculpated Johnson and coerced them until they agreed to inculpate him. Johnson spent 34 years in prison before the DAO located suppressed evidence of the coercion in police files. Based on this buried evidence of police misconduct, Johnson's conviction was vacated in March 2024.

l. **James Dennis**: PPD Homicide Division detectives investigating a murder in 1991 coerced witnesses to identify Dennis while at the same time they intentionally concealed information which provided Dennis with incontrovertible alibi. The detectives' conduct led to the Third Circuit's issuance of an en banc decision concluding that the concealment of evidence violated Dennis's due process rights. See Dennis v. Sec'y, Pa. Dep't of Corr., 834 F.3d 263, 307 (3d Cir. 2016). In 2024 an Eastern District of Pennsylvania jury found two investigating detectives liable for Dennis's wrongful conviction and awarded Dennis $16 million.

m. **Anthony Wright**: Wright was convicted of the 1991 rape and murder of an elderly woman based on Homicide Division detectives' fabrication of a confession and planting of evidence. DNA testing later confirmed Wright's innocence, and he was acquitted at a retrial. His subsequent civil rights action litigated in this Court resulted in a settlement of nearly $10 million.

n. **Troy Coulston**: In 1991, Coulston was convicted of a 1989 murder based on PPD Homicide Division Detectives knowingly presenting fabricated trial testimony, coercing false witness statements from a particularly vulnerable, teenage witness, and suppressing exculpatory evidence undermining the credibility of a key witness, that actual perpetrator of the murder. Mr. Coulston's conviction was vacated in 2021 based on the discovery of previously suppressed exculpatory evidence.

o. **Walter Ogrod**: In 1992, PPD detectives coerced and fabricated a false confession from Ogrod, a trucker with a low-average IQ, to the 1988 murder of a four-year-old girl. Ogrod had driven all night and had not been to bed in 36 hours when the lead detective interrogated him. Detectives interrogated Ogrod for hours, then wrote out a fabricated statement in Q-and-A form they falsely claimed was a verbatim record of a voluntary statement from Ogrod, and coerced Ogrod into signing it. At his first trial, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a notorious jailhouse snitch, the state convicted Ogrod of capital murder. Ogrod has since been exonerated, the charges nolle prossed, and he was released from prison after serving more than 25 years for a crime he did not commit.

p. **Chester Hollman**: PPD detectives framed Chester Hollman for a 1991 murder he did not commit. Detectives coerced a witness, Deirdre Jones, who had no knowledge of the crime, to provide a false statement implicating the innocent

Hollman; they typed out a statement implicating Hollman, falsely attributed it to Jones, and coerced her into signing it. Detectives also fabricated and coerced a statement from another witness, and buried evidence demonstrating Hollman's innocence. In 2019, Hollman was exonerated based on DNA testing excluding him and pointing to another perpetrator. He had spent 28 years wrongly imprisoned.

q.  **Willie Veasy**: Veasy was convicted of a murder based on a 1992 confession secured by PPD Homicide Division Detectives' use of physical force. The confession was plainly untrue in light of a fully corroborated alibi that Veasy was working in a popular and busy restaurant at the time of the murder. Veasy's conviction was vacated in 2019 upon the motion of the Philadelphia District Attorney's Office, and his subsequent civil rights suit resulted in a multi-million-dollar settlement.

r.  **Percy St. George**: A PPD Homicide detective coerced two people in 1993 to give false statements implicating St. George in a murder. When the detective was asked to testify about the allegations of coercion and fabrication, he asserted his Fifth Amendment privilege against self-incrimination and declined to answer questions. Despite that assertion, the detective was permitted to remain active in PPD Homicide Division investigations for several years.

s.  **Johnny Berry**: PPD homicide detectives arrested 16-year-old Johnny Berry for a 1994 robbery murder based on the testimony of an eyewitness who was in the company of the murder victim and the testimony of an alleged accomplice, Tauheed Lloyd. At trial, the eyewitness claimed that detectives had pressured her into identifying Berry and Berry was convicted based solely on Lloyd's testimony. Several years later, Lloyd acknowledged that he had lied about Berry. In 2019, the DAO agreed to vacate Berry's conviction, after which Berry learned that detectives had suppressed information regarding multiple witnesses who had heard Lloyd admit that he, not Berry, was the shooter. Berry's civil suit settled for $5.65 million.

t.  **Terrence Lewis:** PPD detectives fabricated evidence and committed other serious investigative misconduct to convict Lewis of a 1996 murder he did not commit. This included coercing and fabricating witness statements and identifications, and deliberately hiding key exculpatory evidence that would have demonstrated Lewis's innocence. In 2019, Lewis was exonerated after he spent 21 years wrongly imprisoned.

u.  **John Miller**: In June 1997, Miller was arrested for the 1996 murder of Anthony Mullen based on a statement PPD detectives obtained from alleged witness David Williams. Williams recanted during a 1997 preliminary hearing and at trial in 1998. Investigating detectives knew Williams's statement was untrue as he had given them provably false information on other subjects, but they failed to disclose their knowledge of this information undermining Williams's credibility.

They continued to withhold that information for years, even after Williams confessed that he was the person who had committed the murder. In 2019, a federal district court vacated Miller's conviction based on its finding that investigating detectives had suppressed critical information undermining the inculpatory evidence presented at trial, and the DAO subsequently dismissed all charges, stating that Miller had "met his burden of proving his innocence.

v.  **Eugene Gilyard and Lance Felder**: In 1998, Gilyard and Felder were arrested and subsequently convicted of the 1995 murder of Thomas Keal. During a cold-case investigation more than two years after the crime, PPD detectives fabricated and coerced witness identifications and statements and buried exculpatory evidence in order to secure charges against Gilyard and Felder. For example, after witness Keith Williams initially told detectives Felder was not a person he had seen at the time of the crime, detectives coerced Williams to identify Felder's photograph by visiting Williams's home multiple times, cursing and shouting at him, pushing on his head while pointing to Felder's photo. Similarly, after witness Patrick Harris told detectives he did not recognize anyone in the photo arrays he had been shown, detectives fabricated a report stating that Harris had identified Gilyard, when he had not. The true perpetrator confessed in 2011, confirming Gilyard and Felder's innocence, and in 2013 their convictions were vacated. In 2018, Gilyard and Felder reached a settlement with the City for compensation for their wrongful convictions.

w.  **William Johnson**: In September 2005, PPD Homicide Division detectives arrested Johnson for the shooting of an off-duty Philadelphia police officer after he had solicited a sex worker. Detectives pressured two sex workers who had been in the area to identify Johnson and another man as the shooter. In 2023, after the CIU produced materials proving that at least one of the witnesses had been coerced to testify against Johnson, habeas relief was granted, and Johnson was released after 18 years' imprisonment.

x.  **Recco Ford**: In 2007, detectives acting on an unsubstantiated anonymous tip detained two juvenile witnesses without their parents' knowledge and pressured them to identify 16-year-old Recco Ford as the perpetrator of a murder that occurred at a playground in southwest Philadelphia. Ford spent three years in pre-trial detention before his trial where, based on the testimony of two teenaged girls who had seen the shooting and called 911 to report it and who confirmed that Ford was not the perpetrator, he was acquitted. Ford later sued the detectives who caused his prosecution, and the City of Philadelphia settled his lawsuit for several hundred thousand dollars.

y.  **Steven Lazar**: Lazar was convicted of a 2007 murder as a result of PPD Homicide Division Detectiveso, fabricating witness statements from vulnerable individuals and securing a false confession by knowingly subjecting Lazar to more than 30 hours of interrogation while he was undergoing severe opioid withdrawal. Lazar's conviction was vacated in March 2023 based on the

discovery of suppressed evidence after he had spent approximately 16 years in prison.

86.     The City's indifference to the misconduct that gave rise to the above-listed wrongful convictions and misconduct has continued unabated through today. Public news reporting documented that of over 41 cases resulting in exonerations between 2018 and 2025, PPD detectives have conducted only limited investigation into a small number of those cases. Instead of seeking to find the actual perpetrators of the violent crimes giving rise to these prosecutions and instead of remedying unlawful police misconduct, the City has chosen inaction.

87.     As evidenced by the pervasive nature of the conduct and the continuing indifference of the City in these cases, detectives in the PPD Homicide Division had free reign to engage in unconstitutional actions with the knowledge and acquiescence of City policymakers and PPD Homicide Division supervisors and command staff, all of whom were deliberately indifferent to this misconduct.

88.     At the time of the investigation of the Place Bar robbery and murder, and the prosecution of Mr. Young and Charles Sheppard between 1974 and 1982, the PPD had a policy, practice, or custom of coercing confessions and false statements from witnesses, concealing and withholding exculpatory evidence, creating fabricated evidence, and initiating prosecutions without probable cause.

89.     These practices, as exemplified by the investigations in Mr. Young's case and in those detailed above, continued for years due to the deliberate indifference of the City of Philadelphia.  Those practices date back for decades.  These practices were well known to Defendant City, and its policymakers, with respect to criminal investigations and prosecutions as a result of newspaper investigations, including Pulitzer Prize winning reporting in the Philadelphia Inquirer in 1977-1978, governmental investigations, complaints from lawyers and

civilians, and internal police investigations, including the PPD's 39th District Corruption

Scandal in the 1990's, complaints lodged by the public, prior litigation and internal police

investigations.

90.     The 39th District Corruption Scandal involved widespread unconstitutional

practices that were not appropriately addressed or remediated despite pervasive knowledge

throughout the PPD and Defendant City. The police misconduct in the 39th District Corruption

Scandal included constitutional violations that mirror those violations suffered by Mark Young

including omission of material information and suppression of exculpatory evidence, physical

abuse and coercive interrogation tactics, and false allegations of criminal conduct. The PPD was

deliberately indifferent to the officer's misconduct and credible complaints to their internal

compliance department were disregarded.

91.     As a result of a pattern of police misconduct that was in effect at the time of the

investigation of the murder of Walter Palermo for which Mark Young was charged, the United

States District Court for the Eastern District of Pennsylvania entered a consent decree in the

matter of *NAACP v. City of Philadelphia* requiring widespread reforms in the PPD, while also

limiting certain aspects of their investigative practices and policies.

92.     This practice, as exemplified by the investigation into Mr. Young's wrongful

conviction, and those detailed hereinabove, continued for years due to the deliberate indifference

of the PPD and Defendant City to these policies, practices and customs.

93.     During the 1980's and early 1990's, and not long after the time of the

investigation and prosecution of Mark Young by the PPD, there was, within the PPD a pattern,

practice and custom of violating the constitutional rights of criminal suspects and others,

including systemic violations of the Fourth and Fourteenth Amendments. On three (3) separate

occasions in the 1980's, courts in the Eastern District of Pennsylvania issued orders enjoining the

PPD from engaging in these practices:

    a. **Cliett v. City of Philadelphia**: Consent decree arising out of "Operation Cold Turkey", that resulted in the unlawful arrest and detention of 1500 individuals in drug enforcement practices);

    b. **Spring Garden Neighbors v. City of Philadelphia**: Enjoining police sweeps of Latinos in Spring Garden area in a homicide investigation);

    c. **Arrington v. City of Philadelphia**: Enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker").

94.    In a more recent investigation into wrongful convictions in Philadelphia, Inquirer

reporter Samantha Melamed spoke with former homicide detective Michael Chitwood.

Chitwood, who went on to a long career as Upper Darby Police Chief, admitted to the Inquirer

that training of homicide detectives was known to be inadequate:

    Back then, police didn't have the ample data available today: cellphone records, DNA analysis. And, like now, they were facing upward of 400 murders a year, hampered by witnesses too fearful to come forward. **Chitwood said detectives were not formally trained to meet that challenge. They handled cases as they saw fit.**

95.    "There was no set standard. It was just: Solve the case," Chitwood said.

Philadelphia Inquirer, Losing Conviction, May 7, 2021;

https://www.inquirer.com/crime/a/philadelphia-murder-exonerations-wrongful-convictions-

20210507.html

96.    In summary, at the time of the investigation and prosecution of Mark Young, and

for decades after, the PPD and its policymakers were deliberately indifferent to PPD's practice,

policy and custom of:

    a. Concealing and/or failing to disclose exculpatory evidence, engaging in unlawful interrogation of suspects, using coercion and threats during interrogations, unlawful witness detentions and interrogations, fabricating and planting evidence, fabricating witness and suspect statements, and using improper identification

procedures, and using these practices to target people of color for unlawful treatment;

b. Allowing detectives to engage in illegal and coercive tactics to secure evidence in homicide cases.

c. Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct;

d. Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

e. Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and Defendants, including unlawful police interrogations, searches, arrests, coercion of witnesses, falsifying and fabrication of evidence and suppression of exculpatory evidence;

f. Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging PPD police, including the Defendants in this case, to violate the rights of citizens, such as Mark Young.

97. At the time of the investigation and prosecution of Mark Young, and for many years before and thereafter, the PPD and Defendant City has been deliberately indifferent to the need to train, supervise and discipline police officers. The Internal Affairs Division ("IAD") of the PPD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

a. excessive and chronic delays in resolving disciplinary complaints;

b. a lack of consistent, rational and meaningful disciplinary and remedial actions;

c. a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d. the PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent;

e. the PPD discipline, as practiced, was incident-based rather than progressive, thus, repeat violators were not penalized in proportion to the number of violations;

f.  the conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

g.  a global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

h.  serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

i.  lack of an effective early warning system to identify, track and monitor "problem" officers;

j.  IAD frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct, interviews that were conducted were below acceptable standards of police practice and failed to address key issues; and

k.  IAD failed to acknowledge the disproportionate use of force used by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

98.    The PPD's conduct in this case was not an isolated incident and was instead the result of customs, policies and practices of the PPD prior to and at the time of the unlawful investigation into the murder at issue. The PPD, by and through its final policy makers, maintained an official policy, pattern, practice, or custom of the use of coercive techniques in interviews and interrogations to obtain confessions; the fabrication of inculpatory evidence; the fabrication of incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime; and the withholding of exculpatory evidence in violation of Mark Young's and others' constitutional rights.

99.    Further, the PPD failed to train, educate, and supervise officers including Defendants Lyons and Brown regarding proper conduct in police work and investigations. Thus, the Defendant Detectives and the PPD officers were inadequately educated and trained about their constitutional and ethical responsibilities to criminal defendants. The lack of oversight of

Defendant Detectives and other homicide detectives in the PPD by the PPD compounded the constitutional violations by eliminating any mechanism by which such violations would be identified and rectified.

100.    Yet, the PPD and Defendant City, by and through its final policymakers, implemented the policy, practice and customs of coercing jailhouse informants or other criminal defendants into adopting fabricated statements for use in prosecuting and convicting persons of interest in deliberate indifference to the substantial likelihood that these customs, practices, and policies would result in constitutional violations like those that occurred in Mark Young's case.

101.    Such policies, customs and practices of the PPD were the moving force behind Detectives Lyons and Brown's fabrication and coercion of false statements of Wilson, Dancey and Mr. Young via physical and verbal assaults, threats and harassment; the repeated use of a highly suggestive, unreliable photo array to force Dancey's false identification of Mr. Young; and the intentional concealment of exculpatory witness statements of Shanee Neals Williams and the two male patrons at the Place Bar from the prosecution and Mr. Young.

### <u>DAMAGES</u>

102.    The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants and the City of Philadelphia caused Mr. Young to be improperly arrested and subjected to the horrors of imprisonment, unfairly tried, wrongfully convicted and forced to serve more than 40 years in prison for a crime he did not commit.

103.    As a direct result of Defendants' conduct and omissions, Mr. Young sustained injuries and damages, including loss of freedom for more than 40 years, loss of his youth, loss of his relationships with family members, pain and suffering, mental anguish, emotional distress, countless indignities, degradation, permanent loss of natural psychological development, loss of

life's pleasures, and restrictions on all forms of personal freedom, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, voting, travel, enjoyment, and freedom of speech and expression.

104.    As a direct result of Defendants' conduct and omissions, Mr. Young sustained economic injuries and damages, including loss of income from the employment he maintained before his wrongful arrest and incarceration and the loss of career opportunities.

105.    As a direct result of Defendants' conduct and omissions, Mr. Young sustained physical injuries, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

### COUNT I
**42 U.S.C. § 1983: Deprivation of Liberty Without Due Process of Law
Under the Fourteenth Amendment and Denial of a Fair Trial by
Fabricating Evidence and Withholding Material Exculpatory and Impeachment Evidence
(Against All Individual Defendants)**

106.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

107.    The individual Defendants, acting individually and in concert, and within the course and scope of their employment with the Philadelphia Police Department deprived Mr. Young of his clearly established constitutional right to due process of law and to a fair trial by fabricating inculpatory evidence and deliberately using coercion and/or suggestion to obtain inculpatory witness statements, including without limitation the false statements of witnesses, and Mr. Young's fabricated and coerced confession.

108.    The individual Defendants deprived Mr. Young of his right to a fair trial by intentionally withholding, concealing and/or suppressing material exculpatory and impeachment evidence, as previously described herein.

109.    The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Young's clearly established constitutional rights.  No reasonable officer in 1974-1975 would have believed this conduct was lawful.

110.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Young's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Young's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT II
### 42 U.S.C. § 1983: Deprivation of Plaintiff's Right Against Self-Incrimination and to Due Process in Violation of the Fifth and Fourteenth Amendments (Against All Individual Defendants)

111.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

112.    Defendants Lyons and Brown coerced Mr. Young into signing a false inculpatory statement they had fabricated, which they later misrepresented as a voluntary confession.

113.    Additionally, Mr. Young was repeatedly interrogated without being informed of his rights and without being able to make a knowing and informed decision about his participation in the interrogation.

114.    This conduct by the individual defendants violated Mr. Young's constitutional rights and led to his wrongful conviction and the damages claimed herein.

115.    Ultimately, Mr. Young's coerced statement was used against him at trial, on appeal, and in post-conviction proceedings, and it was central to the prosecution's case at each stage.  Its use and admission violated Mr. Young's right against self-incrimination.

116.    No reasonable officer would have believed this conduct was lawful.

117.    As a direct and proximate result of Defendants' actions, Mr. Young was wrongly prosecuted, detained, and incarcerated for over 40 years and suffered other injuries and damages as set forth above.

## COUNT III
### 42 U.S.C. § 1983: Civil Rights Conspiracy
### (Against All Individual Defendants)

118.    The individual Defendants, acting within the course and scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Young of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, deprivation of liberty without due process of law, and his right to a fair trial.

119.    In furtherance of the conspiracy, the Defendants engaged in and facilitated numerous overt acts, including, without limitation, the following:

   a.  Suggesting, coercing, and/or fabricating false, inculpatory evidence in the form of witness statements and confessions;

   b.  Intentionally or with deliberate indifference failing to comply with their duty to disclose *Brady* and impeachment material during the pendency of the case; and

   c.  Committing perjury during hearings and trials.

120.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Young's injuries.  Defendants knew, or should have

known, that their conduct would result in Mr. Young's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT IV
### 42 U.S.C. § 1983: Municipal Liability Claim
### (Against Defendant City of Philadelphia)

121.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

122.    The City of Philadelphia, by and through its final policymakers, had in force and effect during the time of Mr. Young's wrongful arrest and conviction, and for many years preceding and following this investigation, a policy, practice, or custom of unconstitutional misconduct in homicide and other criminal investigations, including in particular the use of coercive techniques in interviews and interrogations to obtain confessions; the fabrication of inculpatory evidence; the fabrication of incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime; and the withholding of exculpatory evidence.

123.    Final policymakers for the City of Philadelphia had actual or constructive notice of these practices, policies, and customs, but repeatedly failed to make any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain confessions; withholding exculpatory evidence; fabricating inculpatory evidence; and, particularly, fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime, and failed to take appropriate remedial and/or disciplinary actions to curb this pattern of misconduct.

124.    Mr. Young's injuries and damages were further proximately caused by policies and practices on the part of policymakers with responsibility of administration of the District

Attorney's office to allow the withholding of exculpatory and/or inconsistent evidence, allow witnesses to provide false testimony, and to pursue profoundly flawed investigations and prosecutions.

125.    The widespread practices described in the preceding paragraphs, of which the City of Philadelphia had actual or constructive notice, were allowed to flourish because the Police Department and District Attorney's office declined to implement sufficient training and/or any legitimate mechanisms for oversight or punishment.

126.    Such unconstitutional municipal customs, practices, and/or policies were the moving force behind Mr. Young's arrest, prosecution, and conviction and over 40 years of incarceration, as well as all the other injuries and damages set forth above.

**PUNITIVE DAMAGES**

127.    The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

128.    The conduct of the individual Defendants was outrageous, malicious, wanton, willful, reckless, and intentionally designed to inflict harm upon Plaintiff.

129.    As a result of the acts of the Defendants alleged in the preceding paragraphs, Plaintiff is entitled to punitive damages.

**WHEREFORE**, Plaintiff requests the following relief:

a.    That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

b.    That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

c.    A declaratory judgment that the practices and policies complained of are

unconstitutional;

d.    For pre-judgment and post-judgment interest and recovery of Plaintiff's

costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42

U.S.C. § 1983 claims; and

e.    For such other and further relief as appears reasonable and just.


         MARRONE LAW FIRM, LLC

By:   s/ Michael D. Pomerantz
       Joseph M. Marrone, Esquire
       PA Atty ID# 64920
       Michael D. Pomerantz, Esquire
       PA Atty ID# 83415
       Attorney for Plaintiff
       200 South Broad Street, Suite 610
       Philadelphia, PA  19102
       (215) 732-6700
       mpomerantz@marronelaw.com
       Date: January 12, 2026